IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

RONNIE L. TRIMBLE                                                                                              PLAINTIFF

v.                                          Case No. 3:11-CV-03024

UNUM LIFE INSURANCE COMPANY OF AMERICA                                        DEFENDANT

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ronnie L. Trimble brings this action pursuant to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, alleging Defendant Unum Life Insurance Company of America wrongly denied his claim for long term disability benefits. Before the Court are the Administrative Record (Doc. 8), Plaintiff's Brief (Doc. 9), which is incorrectly styled "Motion for Summary Judgment," and Defendant's Brief (Doc. 10). For the reasons stated herein, the Court finds that Defendant's decision to deny benefits is AFFIRMED, Plaintiff's claim is DENIED, and this case is DISMISSED with prejudice.

**I. Background**

Plaintiff was a full-time maintenance technician with MMI Products, Inc. ("MMI"), from January 23, 2006 until April 24, 2007. He stopped working because of severe pain from a knee injury originally suffered in 2003, when Plaintiff was involved in a workplace accident with a previous employer. (Doc. 8-12, p. 8). He underwent a right knee arthroscopy, medial meniscectomy, on or about April 25, 2007, the day after he stopped working for MMI. *Id.* at p. 11. He underwent a left knee arthroscopy on or about November 16, 2007. (Doc. 8-8, p. 16). Plaintiff applied for and received short term disability benefits pursuant to a policy of insurance administered by Defendant from April 24, 2007 until October 30, 2007. (Doc. 8-5, p. 18). Plaintiff then filed a claim for long term disability benefits, which was approved on May 16, 2008. However, Plaintiff's

benefits were terminated as of October 22, 2009 because Defendant no longer considered him to be disabled. (Doc. 8-28, pp. 3-6). The policy administered by Defendant required that, after 24 months of payments, a claimant must establish that he is unable to perform "the duties of any gainful occupation" he is qualified to do, according to his education, in order to continue receiving benefits. Defendant concluded that Plaintiff failed to meet this standard and denied his claim for further long term disability benefits. (Doc. 8-4, p. 8).

### A. Plaintiff's Medical Evidence

Plaintiff's knee problems began well before he began working for his most recent employer, MMI. (Doc. 8-5, p. 12). After initially injuring his knee by jumping off a table at his workplace in 2003, Plaintiff underwent a right knee meniscal repair on January 17, 2004. (Doc. 8-12, p. 8). On May 13, 2004, his attending physician determined that the tear in his knee was not healing, and another right knee surgery, an arthroscopy, was performed on June 29, 2004. *Id.* at p. 9. Plaintiff began working for MMI in January of 2006, and in May of 2006 he received corticosteroid injections to his right knee due to reported right knee swelling and pain. (Doc. 8-13, p. 2). Plaintiff's physician, Dr. Arnold, performed a third surgery on Plaintiff's right knee in April of 2007, one day after Plaintiff quit working for MMI. (Doc. 8-8, p. 20). Plaintiff reportedly enjoyed some relief from pain after this last surgery. *Id.* However, on June 28, 2007, Dr. Arnold diagnosed Plaintiff with left knee pain due to compensating for weakness or pain in the right knee. (Doc. 8-29, p. 9). Dr. Arnold then performed surgery on Plaintiff's left knee on or about November 16, 2007. (Doc. 8-8, p. 16).

Plaintiff accompanied his December 4, 2007 claim for disability benefits with an attending physician statement from Dr. Arnold. In the statement, Dr. Arnold determined that Plaintiff was restricted from "lifting, pushing, pulling, squatting, or climbing – no prolonged standing or walking." (Doc. 8-2, p. 26). Plaintiff reported no cognitive problems; rather, his stated reason for

disability was limited to knee pain and swelling. (Doc. 8-5, pp. 12-14). Further reports from Dr. Arnold noted that as of December 18, 2007, Plaintiff was released to return to work, with restrictions. (Doc. 8-12, p. 10). On March 11, 2008, Dr. Arnold recommended that Plaintiff return to work but "not lift, push or pull more than 100 pounds." (Doc. 8-29, p. 1). Based on these reports from Dr. Arnold, Defendant determined that Plaintiff qualified for long term disability benefits for the period of October 22, 2007 through April 21, 2008, based on Defendant's conclusion that Plaintiff was disabled from his own occupation, which was classified as "maintenance repairer industrial."[1] (Doc. 8-20, p. 8).

On October 29, 2009, Dr. Arnold re-checked Plaintiff's knees and diagnosed continuing right knee pain and right lower extremity paresthesia.[2] (Doc. 8-31, p. 28). Another statement from Dr. Arnold dated June 4, 2009 released Plaintiff to work but recommended that Plaintiff not engage in "lifting, pushing, pulling over 100 pounds, no squatting or climbing." (Doc. 8-23, p. 21). On August 3, 2009, Dr. Arnold referred Plaintiff to a neurologist, Dr. Morse, to evaluate numbness in Plaintiff's right leg. (Doc. 8-25, p. 26). Dr. Morse concluded that there was no neurological basis for the claim of numbness, stating: "I do not find any motor nerve abnormalities. There is no significant pain. I do not believe nerve conductions would really add anything to this. This does not limit his activities. I explained there is no treatment for the numbness. There is not evidence of neuropathic pain." (Doc. 8-25, p. 28).

---

[1] The Social Security administration denied Plaintiff's claim for disability benefits on March 4, 2008. (Doc. 8-16, p. 11).

[2] The medical definition of "paresthesia" is: "A spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking)." Stedman's Medical Dictionary 1425 (28th ed. 2006).

A neuropsychologist named Dr. Smith then performed an examination of Plaintiff on August 10, 2009. (Doc. 8-30, pp. 14-17). Dr. Smith determined that Plaintiff suffered from "diffuse organic brain dysfunction of moderate severity. . . believed to be precipitated by the brain and spinal cord's adaptive response to chronically painful disease process. . ." *Id.* at 16. This was the first mention of any psychological or cognitive impairment related to Plaintiff's disability since Plaintiff filed his claim in 2007.

### B. Disability Benefits Under the Plan

Plaintiff received long term disability benefits pursuant to the benefit plan ("Plan") administered by Defendant. An employee with a "disability" is defined by the Plan as: ". . . limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and . . . a 20% or more loss in your indexed monthly earnings due to the same sickness or injury." (Doc. 8-4, p. 8). The term "material and substantial duties" means "duties that are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified." (Doc. 8-5, p. 1). The term "regular occupation" refers to "the occupation you are routinely performing when your disability begins." *Id.* at p. 3.

When initially determining Plaintiff's eligibility to receive long term benefits, Defendant analyzed whether Plaintiff was considered disabled in performing the duties required for his "regular occupation," which was that of maintenance technician. However, once Plaintiff received long term benefits for 24 months, according to the terms of the Plan, Defendant was required to re-examine Plaintiff's continuing eligibility for benefits based on a different standard. Accordingly, after Plaintiff received benefits for 24 months, from October 2007 to October 2009, the relevant Plan language required the following analysis: "After 24 months of payments, you are disabled when

Unum determines that due to the same sickness or injury you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience." (Doc. 8-4, p. 8).

Plaintiff's employment history was in maintenance and construction. He received a GED in 1980. He was a certified welder and had a commercial driver's license. (Doc. 8-24, p. 14). Plaintiff filled out an education and employment history form (Doc. 8-17, pp. 27-29), also noting his experience in electrical and mechanical repair. *Id.* A vocational specialist hired by Plaintiff opined on October 4, 2007, that Plaintiff has "no transferrable skills that transfer to jobs that are sedentary as that term is defined and vocationally is limited to sedentary work." (Doc. 8-12, p. 16). The specialist also opined that "entry level unskilled jobs that are sedentary are extremely limited" and that, in his view, Plaintiff was therefore "unemployable." *Id.*

Defendant's vocational consultant conducted her own assessment of Plaintiff's vocational opportunities and concluded just the opposite, reporting on June 16, 2009 that Plaintiff "appears to have transferable skills to alternate gainful occupations which would fall within his restrictions and limitations." (Doc. 8-24, p. 14). The consultant then analyzed whether these alternate occupations would exist within 50 miles of Plaintiff's residence. This formal labor market survey was completed on or about June 25, 2009. (Doc. 8-25, pp. 2-7). Ten possible occupations were identified by Defendant's consultant, including dispatcher, dump truck driver, pizza deliverer, and product assembler. *Id.* Sixteen employers were identified within 50 miles of Plaintiff's residence. *Id.* at p. 10. When the consultant submitted this analysis to Defendant, Defendant's disability benefits specialist concluded that Plaintiff did not qualify for further benefits under the new standard required after payout of 24 months of benefits. Defendant's quality control consultant approved the denial

of further long term benefits on October 8, 2009. (Doc. 8-29, pp. 25-27).

### C. Defendant's Medical Consultants

Dr. Zimmerman, a licensed psychologist, was asked by Defendant to evaluate the psychological/cognitive testing and diagnosis recommended by Plaintiff's doctor, Dr. Smith. (Doc. 8-35, p. 13). Dr. Zimmerman analyzed all of the medical records, including those of Drs. Arnold and Morse, and concluded that there was not consistent support in the test data and medical records to justify Plaintiff's claim of cognitive dysfunction. She noted that Dr. Arnold's records did not reference observed cognitive or emotional complaints over a period of four years of treating Plaintiff for his knee pain. Dr. Morse, Plaintiff's treating neurologist, also did not reference a history of "worsening neurocognitive symptoms, emotional symptoms or sleep pattern disturbance as reports to Dr. Vann [sic] a week later . . ." *Id.* at p. 14. Dr. Zimmerman also disagreed with Dr. Smith's test methods and procedures, opining that he reached a diagnosis of neurocognitive impairment "without benefit of medical records" to confirm Plaintiff's physical problems. *Id.* Moreover, it was significant to Dr. Zimmerman that Dr. Morse did not confirm Plaintiff's claim of suffering severe pain. Dr. Zimmerman noted: "Dr. Morse . . . documented no significant pain and no limitation in activity on 8/3/09." *Id.* at p. 15.

Defendant further contends that Plaintiff personally advised Defendant's representative on September 23, 2008 that the only pain medication he was taking was over-the-counter Ibuprofen. (Doc. 8-17, p. 2). This fact, according to Defendant, further demonstrates that the level of Plaintiff's pain was not severe enough to cause mental impairment of the severity reported by Dr. Smith.

Finally, regarding Plaintiff's vocational consultant, Defendant points out that the consultant's report was written prior to Plaintiff's left knee surgery and prior to Plaintiff's release to return to

work by Dr. Arnold on December 18, 2007. Also, Defendant notes that Plaintiff's vocational consultant did not conduct a labor market survey, as Defendant's consultant performed, to determine if there were entry level unskilled jobs available in Plaintiff's geographic area. (Doc. 8-12, p. 16).

## II. Standard of Review

Generally, once a plaintiff has exhausted his administrative remedies, the court's function is to conduct a review of the record that was before the administrator of the plan when the claim was denied. *See Farfalla v. Mutual of Omaha Ins. Co.*, 324 F.3d 971, 974-75 (8th Cir. 2003); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). A denial of benefits claim under ERISA is reviewed for an abuse of discretion when "a plan gives the administrator discretionary power to construe uncertain terms or to make eligibility determinations." *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 998-99 (8th Cir. 1997)(en banc)(citing *Firestone*, 489 U.S. at 111). If a plan confers discretionary authority, then the Court must defer to the determination made by the administrator or fiduciary unless such determination is arbitrary and capricious. *Firestone*, 489 U.S. at 115. "[R]eview for an 'abuse of discretion' or for being 'arbitrary and capricious' is a distinction without a difference" because the terms are generally interchangeable. *Jackson v. Prudential Ins. Co. of Am.*, 530 F.3d 696, 701 (8th Cir. 2008)(citing *Schatz v. Mutual of Omaha Ins. Co.*, 220 F.3d 944, 946 n.4 (8th Cir. 2000)).

Abuse of discretion is the proper standard of review in this case, as the benefits plan administered by Plaintiff's former employer MMI delegated to Defendant the discretionary authority to make eligibility determinations. (Doc. 8-4, p. 29). The decision of the administrator may only be overturned if it was not "reasonable, i.e., supported by substantial evidence." *Donaho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir. 1996). The administrator's decision will be deemed reasonable

if "a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Id.* Therefore, the Court will not disturb Defendant's reasonable decision to deny further benefits.

The Court will examine the basis behind the administrator's decision in order to determine if it is supported by substantial evidence. The evidence should be assessed by its quantity and quality, and this review, "though deferential, is not tantamount to rubber-stamping the result." *Torres v. Unum Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005).

There are five factors the Court will analyze in order to determine whether an administrator's decision was reasonable:

> (1) whether the administrator's interpretation is consistent with the goals of the Plan; (2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Id.* (citing *Shelton v. ContiGroup Cos., Inc.*, 285 F.3d 640, 643 (8th Cir. 2002)).

In addition to analyzing these five factors, the Court will also consider that a conflict of interest may exist in this case, as Defendant both determines whether an enrollee is eligible for benefits and also pays the benefits out of its own pocket. Plaintiff contends the conflict of interest should be considered as a factor in determining whether there was an abuse of discretion. The Supreme Court has stated that a reviewing court is to give importance to this conflict of interest depending upon how closely the other factors are balanced. *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2351 (2008). Accordingly, the Court will review the denial of benefits for an abuse of discretion, taking into account relevant factors to include the potential conflict of interest.

**III. Discussion**

In determining whether Defendant's denial of benefits was reasonable and supported by substantial evidence, the Court reviews the quantity and quality of the medical evidence provided in the administrative record, as well as the relevant provisions of the benefit plan. Under the Eighth Circuit's holding in *Shelton*, the first factor the Court must consider in evaluating the reasonableness of a Plan administrator's denial of ERISA benefits is whether the administrator's interpretation is consistent with the goals of the Plan. 285 F.3d at 643. Here, the Plan administrator awarded long term disability benefits for 24 months, but then denied benefits thereafter. After providing 24 months of benefits to a claimant, the Plan's goal or intent is to "provide coverage for a payable claim which occurs while . . . covered under the policy or plan." (Doc. 8-4, p. 6). A payable claim is one for which Defendant is liable under the terms of the policy, which is triggered by a finding of disability. As discussed above, a claimant is disabled according to the standard applicable *after* 24 months of payments when he is "unable to perform the duties of any gainful occupation" which his education, training, or experience qualify him to do. *Id.* at p. 8.

Considering the "any gainful occupation" standard that is applicable in the case at bar, the Court finds that the denial of benefits was consistent with the goals of the Plan. Turning first to the medical data present in the administrative record, Plaintiff's treating physician, Dr. Arnold, released Plaintiff to return to work in December of 2007 with certain restrictions on pulling and lifting. Dr. Arnold followed up in March of 2008 and again cleared Plaintiff to return to work. Plaintiff's treating neurologist, Dr. Morse, concluded that Plaintiff suffered from no neurological deficits. Therefore, as neither of Plaintiff's treating physicians opined that Plaintiff is disabled from performing any gainful occupation, Defendant acted reasonably in relying on the opinions of these

9

physicians and concluding that Plaintiff was capable of work.

As for Plaintiff's complaints of neuropsychological deficits, including memory problems and other cognitive disorders, the Court finds that there is little to no evidence substantiating these claims. The only doctor's report that relates to these claims is that of Dr. Smith, who evaluated Plaintiff once. Defendant's expert, Dr. Zimmerman, reviewed Plaintiff's file and opined that Dr. Smith's testing methodology and reliance on Plaintiff's reported chronic pain were not supported by the medical record. Moreover, Dr. Zimmerman noted that Dr. Smith's report does not suggest that Plaintiff lacks the cognitive capacity to engage in any gainful occupation, which is the standard Defendant was required to use when deciding whether to continue providing long term disability benefits. Accordingly, Defendant did not abuse its discretion in relying on Dr. Zimmerman's medical conclusions over Dr. Smith's on the issue of Plaintiff's alleged neurocognitive dysfunction. The Supreme Court has held that insurance companies are not required to give more weight to the opinions of doctors who treat the patient, as opposed to those who merely review the patient's file. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

The second factor in assessing the reasonableness of Defendant's decision is whether the interpretation renders any language in the Plan meaningless or internally inconsistent. *Shelton*, 285 F.3d at 643. Since the medical evidence supports a determination that Plaintiff is not so disabled that he cannot engage in any gainful occupation, Defendant's decision is a reasonable interpretation of the Plan's terms. Regarding the availability of possible jobs in the marketplace for which Plaintiff would be qualified, the vocational experts hired by Plaintiff and Defendant appear to disagree. However, the Court is persuaded that Defendant reasonably relied on its expert, who performed a labor market survey relative to jobs in Plaintiff's area. Plaintiff's own expert conducted no such

survey and in fact conceded that Plaintiff would be qualified to do at least sedentary work, if such work were available. Accordingly, it was not an abuse of Defendant's discretion to consider Plaintiff qualified to engage in a number of potential gainful occupations potentially available in the relevant market.

In examining the remaining three of the five factors announced in *Shelton*, this Court must assess the following in determining whether an abuse of discretion occurred: (1) whether the administrator's decision to deny benefits conflicts with the substantive or procedural requirements of the ERISA statute; (2) whether the administrator has interpreted the words at issue consistently; and (3) whether the administrator's interpretation is contrary to the clear language of the Plan. In light of the Court's review of the administrative record, the remaining *Shelton* factors have been satisfied. The Court finds that Defendant's decision was supported by substantial evidence. The Eighth Circuit in evaluating ERISA cases has concluded that if the decision of a claim administrator is supported by a reasonable explanation, it should not be disturbed, even though a different reasonable interpretation could have been made. *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637 (8th Cir. 1997)(citing *Donaho*, 74 F.3d at 899).

Finally, there is no evidence in the record to indicate that a conflict of interest influenced Defendant's decision to deny further benefits after 24 months of payments. In point of fact, Plaintiff's own treating physicians released him to return to work, which indicates Plaintiff's ability to engage in gainful employment, even if such employment were not the job Plaintiff performed at the time benefits were originally approved. Accordingly, the conflict of interest factor is not significant in the Court's abuse of discretion review. The Court finds that Defendant did not abuse its discretion in denying Plaintiff's claim and that Defendant's decision was supported by substantial

evidence on the record.

**IV. Conclusion**

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendant's decision to deny benefits is AFFIRMED, Plaintiff's claim is DENIED, and this case is DISMISSED with prejudice. All parties are instructed to bear their own fees and costs.

IT IS SO ORDERED this 31st day of January, 2012.

*/s/ P. K. Holmes, III*
P.K. HOLMES, III
UNITED STATES DISTRICT JUDGE